SPENCER P. SCHEER #107750
JOSHUA L. SCHEER #242722
REILLY D. WILKINSON #250086
JONATHAN SEIGEL #168224
SCHEER LAW GROUP, LLP
4340 Von Karman, Suite 200
Newport Beach, CA 92660
Telephone: (949) 263-8757
Facsimile: (949) 209-3320
LMC.100-006S

Attorneys for Secured Creditor
WVUE 2015-1, its successors and/or assignees

UNITED STATES BANKRUPTCY COURT FOR

THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re: | Bk. No. 16-51265-MEH |
| TULA APONTE aka TULA MIRIAM APONTE CABRERO | Chapter 13 |
| Debtor. | R.S. No. JLS-326 |
| | **DECLARATION OF DAVID HADDAD IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND CO-DEBTOR STAY** |
| | Hearing-<br>Date: August 19, 2016<br>Time: 10:00 a.m.<br>Place: Bankruptcy Court<br>280 South First Street<br>San Jose, CA |

I, DAVID HADDAD, declare and state:

1.     As to the following facts, I know them to be true of my own personal knowledge and if called upon to testify in this action, I could and would testify competently to the following facts personally known to me to be true.

2.     I am an employee and designated custodian of records of LONGVUE MORTGAGE CAPITAL, INC. ("LMC"). LMC is the servicer for WVUE 2015-1 ("Secured Creditor"), the current beneficiary under the subject Deed of Trust. I am the Executive Vice

President of LMC, who is authorized to act on behalf of Secured Creditor, which holds a secured lien on the subject property described herein. I am the employee of LMC most familiar with this case and the facts herein and am authorized to make these statements on behalf of Secured Creditor. I have reviewed the loan file and records of LMC and Secured Creditor before making these statements. The loan records are kept in the regular course of business, at or near the time of the event which is noted or memorialized. As to any statements regarding equity or lack of equity contained within this Declaration, which are made upon information and belief, these statements are made after examination of the loan file and after consideration of the following factors:

    1)    the loan to value ratio;

    2)    existence of junior liens;

    3)    amount of arrearages; and

    4)    the Debtor's schedules

3.    TULA APONTE ("Debtor") is an individual and the Chapter 13 Debtor herein and Secured Creditor's borrower. Debtor and Rodmen Tello ("Co-Debtor") are the borrowers on the subject loan.

4.    Devin Derham-Burk has been appointed as the Chapter 13 Trustee in the instant bankruptcy. By virtue of her position as Chapter 13 Trustee, she may hold title to the subject property in that capacity. To the extent relief sought herein is granted, Devin Derham-Burk should be bound by any such judgment.

5.    On April 27, 2016, Debtor filed a Petition under Chapter 13 of the Bankruptcy Code.

6.    Secured Creditor is the current payee of a Promissory Note dated November 15, 2007 in the principal amount of $417,000.00 (the "Note") secured by a First Deed of Trust of same date, which bears interest as specified therein. The original Note is held by Secured Creditor and a copy is attached hereto as Exhibit "1" and is incorporated herein by reference.

7.    The indebtedness evidenced by the Note is secured by a Deed of Trust (the "Deed of Trust") executed and recorded in Santa Clara County and which encumbers the real property

located at 1485 Olympic Dr., Milpitas, CA 95035, (the "Property").  A copy of the Deed of Trust and all assignments are attached hereto as Exhibit "2" and incorporated herein by reference.

8.     Secured Creditor is the current holder of the Note and maintains all beneficial interest relating to the subject loan.

9.     This is the **fifth** bankruptcy relating to the Property.  Pursuant to Secured Creditor's records, as well as public records the following bankruptcies relate to the Property, in addition to the current bankruptcy:

    a.  Debtor filed a previous Chapter 13 bankruptcy petition on September 8, 2011, Case No. 11-58431-ASW that was dismissed on October 27, 2011.  A copy of the Dismissal Order from Secured Creditor's loan file is attached hereto as Exhibit "3".

    b.  Debtor also filed a previous Chapter 13 bankruptcy petition on December 1, 2011, Case No. 11-61063-SLJ that was dismissed on October 11, 2013.  A copy of the Dismissal Order from Secured Creditor's loan file is attached hereto as Exhibit "4".

    c.  Debtor filed a previous Chapter 13 bankruptcy petition on March 20, 2014, Case No. 14-51195-MEH ("Third Bankruptcy") that was dismissed on September 30, 2015.  The Court required that Debtor confirm a plan or convert the case by September 30, 2015, which did not occur.  A copy of the Order Following Court Hearing re Chapter 13 Case *and* subsequent Dismissal Order from Lender's loan file is attached hereto as Exhibit "5".

    d.  Co-Debtor filed a previous Chapter 7 bankruptcy petition on December 12, 2014, Case No. 14-54898-ASW that was discharged on March 24, 2015.  A copy of the Discharge Order is attached hereto as Exhibit "6".

10.     Debtor and Co-Debtor have defaulted on the Note.  On the basis of the Debtor and Co-Debtor's failure to make required payments the Debtor and Co-Debtor are now due and owing to Secured Creditor:

Unpaid Principal Balance:                              $417,000.00

Pre-Petition Arrearages:

5 Monthly Payments from 8/1/2011
through 12/1/2011 at $2,128.44                          $10,642.20

| | |
|---|---|
| 12 Monthly Payments from 1/1/2012 through 12/1/2012 at $1,433.44 | $17,201.28 |
| 12 Monthly Payments from 1/1/2013 through 12/1/2013 at $1,259.69 | $15,116.28 |
| 24 Monthly Payments from 1/1/2014 through 12/1/2015 at $1,129.38 | $27,105.12 |
| 4 Monthly Payments from 1/1/2016 through 4/1/2016 at $1,216.25 | $4,865.00 |
| Late Charges | $8,450.62 |
| Foreclosure Fees | $7,897.06 |
| Tax Advances[1] | $50,470.01 |
| Subtotal Pre-Petition Delinquencies | $141,747.57 |
| Post-Petition Delinquencies: | |
| 3 Monthly Payments from 5/1/2016 through 7/1/2016 at $1,216.25 | $3,648.75 |
| 3 Late Charges at $60.81 each | $182.43 |
| Attorneys' Fees | $1,515.00 |
| Subtotal Post-Petition Delinquencies | $5,346.18 |
| TOTAL ARREARAGES | $147,093.75 |

**[Please note that an additional $1,216.25 becomes due and owing on the 1st day of each month, as well as an additional late charge 15 days thereafter.**

11. The total amount now owed to Secured Creditor on Loan No. xxxxxx0931 is $481,896.96[2] as of July 19, 2016.

12. Interest continues to accrue as set forth in the Note.

13. Secured Creditor has performed each and every act required by the terms of the Deed of Trust.

14. Debtor has not applied for a loan modification with the current Secured Creditor or its servicer. Debtor filed this petition on April 27, 2016. Debtor's operative amended plan

---

[1] Please note that interest continues to accrue on the advances as allowed pursuant to the loan documents and applicable law.
[2] The total represents the payoff amount and is less than the unpaid Principal Balance plus Total Arrearages listed above because the delinquent payment consists of principal and interest.

("Plan") provides that the matter will be referred to the MMM Program and that Debtor will pay $0.00 as a Monthly Modification Installment.

15.     Secured Creditor has yet to receive a request or referral to this program or any payments on its claim. Secured Creditor asserts that the attempt to pay $0 on its claim is in bad faith. The case has been pending for approximately three (3) months as of the date of this Declaration with no payments whatsoever made to Secured Creditor.

16.     As Secured Creditor has detailed in its Objections to Plan, given the history of filings, the lack of payment and the failure to move this case forward, Secured Creditor asserts that this filing is in bad faith and it should be entitled to relief from stay.

17.     Secured Creditor requests authority to commence or complete foreclosure proceedings relative to the Property, but is prevented from doing so by the filing of Debtor's petition which operates as an Automatic Stay prohibiting Secured Creditor from taking any action or commencing any Court proceeding to enforce a lien upon the Debtor's real property. Secured Creditor filed its Notice of Default on January 19, 2016, the Notice of Sale was recorded on April 27, 2016 and the foreclosure sale was set for May 27, 2016. This Bankruptcy was filed after the Notice of Sale was recorded.

18.     Attached to this Declaration is an Account Statement which provides a post-petition payment history, which evidences the post-petition obligations that are accrued and are unpaid. The Account Statement shows when each post-petition payment was due, all payments received by Secured Creditor and the date each post-petition payment was received by Secured Creditor. A copy of the Account Statement is attached hereto as Exhibit "7" and is incorporated herein by reference.

19.     Secured Creditor's records reflect that there is currently a Second trust deed on the Property in favor of Chase. The approximate balance of said trust deed obligation is $127,000.00 pursuant to Debtor's schedules on file with this Court. Secured Creditor has been unable to verify the payment status of the junior lienor, and said junior lienor's loan may in fact be delinquent. Secured Creditor will seek leave of court to specify the unpaid balance and amount of delinquency thereon at the time of the hearing. Secured Creditor requests that the

1  court take Judicial Notice of Debtor's Schedules on file with this court pursuant to Federal Rule
2  of Evidence 201.

3      20.    The Debtor has listed the value of the Property as $568,411.00 in her Schedules
4  on file with this court. Secured Creditor requests that the court take Judicial Notice of Debtor's
5  Schedules on file with this court pursuant to Federal Rule of Evidence 201.

6      21.    The Note and Deed of Trust provide that Secured Creditor shall be entitled to
7  recover from the Debtor and that the real property shall secure the payments of all attorney's fees
8  and costs incurred by Secured Creditor to collect upon the real property. By virtue of the
9  Debtor's default, Secured Creditor has necessarily incurred such fees and costs and will continue
10  to incur such fees and costs.

11      I declare under penalty of perjury under the laws of the United States of America
12  that the foregoing is true and correct and that this Declaration was executed on
13  _July 27, 2016_, at _Newport Beach, CA_ (city, state).

14

15

16  DAVID HADDAD

17

18

19

20

21

22

23

24

25

26

27

28

6

# INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published In The Wall Street Journal)
### Rate Caps - 10 Year Interest Only Period)

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.

NOVEMBER 15, 2007                    San Jose,                         CALIFORNIA
[Date]                               [City]                            [State]

1485 OLYMPIC DR, MILPITAS, CA 95035-6515
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.   $417,000.00   (this amount is called "Principal"), plus interest, to the order of Lender. Lender is FLAGSTAR BANK, FSB, A FEDERALLY CHARTERED SAVINGS BANK.

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   6.125%.   The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment on the   1ST   day of every month, beginning on   JANUARY 1, 2008. Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.

I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on   DECEMBER 1, 2037,   I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
5151 CORPORATE DR
TROY, MI  48098-2639

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S.   $2,128.44   until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

### 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The initial fixed interest rate I will pay will change to an adjustable interest rate on the   1ST   day of DECEMBER, 2012,   and the adjustable interest rate I will pay may change on that day every   12TH   month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

Initials: _R.T_

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE-ONE-YEAR LIBOR INDEX-10 Year Interest Only Period-Single Family-Fannie Mae Uniform Instrument Form 3535 6/06 (rev. 9/06)
© 2005, 2007 Online Documents, Inc.                Page 1 of 4                F3535NOT  0702

T.A

11-15-2007 18:21

**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding **TWO AND FIVE-EIGHTHS** percentage point(s) ( 2.625% ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.125% or less than 2.625%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than **TWO** percentage point(s) ( 2.000% ) from the rate of interest I have been paying for the preceding 12 month(s). My interest rate will never be greater than 11.125%.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

Initials: _R.T_
_T.A._

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE-ONE-YEAR LIBOR INDEX-10 Year Interest Only Period-Single Family-Fannie Mae Uniform Instrument Form 3535 6/05 (rev. 9/06)
© 2005, 2007 Online Documents, Inc.  Page 2 of 4  F3535NOT 0702
11-15-2007 18:21

**(B) Default**
If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**
If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**
I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A) Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B) When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate

Initials: ____
T.A.

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE-ONE-YEAR LIBOR INDEX-10 Year Interest Only Period-Single Family-
Fannie Mae Uniform Instrument Form 3535 6/06 (rev. 9/06)
© 2006, 2007 Online Documents, Inc.

F3535NOT 0702
11-15-2007 18:21

the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)
RODHEN TELLO

_____(Seal)
TULA APONTE

[Sign Original Only]

MULTISTATE INTEREST-ONLY PERIOD ADJUSTABLE RATE NOTE-ONE-YEAR LIBOR INDEX-10 Year Interest Only Period-Single Family-Fannie Mae Uniform Instrument Form 3535 6/06 (rev. 9/06)
© 2005, 2007 Online Documents, Inc.                Page 4 of 4                F3535NOT  0702
11-15-2007 18:21

| DOCUMENT: 19659746 | Pages: 37 |
|---|---|

Fees.... 117.00
Taxes...
Copies..
AMT PAID 117.00

REGINA ALCOMENDRAS
SANTA CLARA COUNTY RECORDER
Recorded at the request of
Alliance Title Company

RDE # 009
11/21/2007
8:00 AM

SPACE ABOVE THIS LINE FOR RECORDER'S USE

RECORDING REQUESTED BY
Alliance Title Company
AND WHEN RECORDED MAIL TO

Name      Flagstar Bank, FSB
Street      Attn: Final Doc Dept., Mail Stop W-530-3
Address
              5151 Corporate Drive
City, State  Troy, MI 48098
&
Zip

Order No.   11557727

THIS DEED OF TRUST IS SIGNED AND INITIALED IN COUNTERPART

Deed of Trust

SEPARATE PAGE PURSUANT TO GOVT CODE 27361.6

EXHIBIT "2"



ALLIANCE TITLE CO.

\# ▓▓▓▓▓▓▓▓▓▓

After Recording Return To:
FLAGSTAR BANK
5151 CORPORATE DRIVE
TROY, MI 48098
FINAL DOCUMENTS, MAIL STOP W-530-3

Escrow No.: ▓▓▓▓▓▓▓▓
V2 WBCD LOAN # ▓▓▓▓▓▓▓▓

——————————— [Space Above This Line For Recording Data] ———————————

# DEED OF TRUST

MIN ▓▓▓▓▓▓▓▓▓▓

## DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
(A) "Security Instrument" means this document, which is dated NOVEMBER 15, 2007,                together with all Riders to this document.
(B) "Borrower" is Rodmen Tello an unmarried man as to an undivided 49% interest, Tula Aponte an unmarried woman as to an undivided 2% interest and Luis Roberto Arroyo-Egoavil as to an undivided 49% interest as tenants in common..

Borrower is the trustor under this Security Instrument.
(C) "Lender" is FLAGSTAR BANK, FSB.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01          Initials: _Rt TA_
© 1999-2004 Online Documents, Inc.                    Page 1 of 12                    CAEDEED          CAEDEDL 0402
                                                                                                      11-15-2007 18:21

Lender is a FEDERALLY CHARTERED SAVINGS BANK organized and existing under the laws of UNITED STATES OF AMERICA. Lender's address is 5151 CORPORATE DR, TROY, MI 48098-2639.

V2 WBCD LOAN #

(D) "Trustee" is JOAN H. ANDERSON.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated NOVEMBER 15, 2007. The Note states that Borrower owes Lender ******************FOUR HUNDRED SEVENTEEN THOUSAND AND NO/100 ************************************************** Dollars (U.S. $417,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than DECEMBER 1, 2037.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [x] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] 1-4 Family Rider
- [ ] V.A. Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] Other(s) [specify]

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "Escrow Items" means those items that are described in Section 3.

(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT Form 3005 1/01
© 1999-2004 Online Documents, Inc.     Page 2 of 12

Initials: R.T TA
CAEDEDL 0402
11-15-2007 18:21

Case: 16-51265    Doc# 20-3    Filed: 08/04/16    Entered: 08/04/16 16:14:43    Page 13 of 43

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                                    [Type of Recording Jurisdiction] of SANTA CLARA
[Name of Recording Jurisdiction]:
SEE PRELIM
APN #: 0883003300

which currently has the address of 1485 OLYMPIC DR, MILPITAS,
                                                                                          [Street] [City]
California 95035-6515          ("Property Address"):
              [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01          Initials: _RUTTA_
© 1999-2004 Online Documents, Inc.                    Page 3 of 12                                   CAEDEDL 0402
                                                                                                    11-15-2007 18:21

may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac **UNIFORM INSTRUMENT**    Form 3005 1/01
© 1999-2004 Online Documents, Inc.                         **Page 4 of 12**                    CAEDEDL  0402

Initials: _R.T.T.A._

11-15-2007 18:21

any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3005 1/01        Initials: R.T T.A
© 1999-2004 Online Documents, Inc.        Page 5 of 12        CAEDEDL 0402
11-15-2007 18:21

Case: 16-51265    Doc# 20-3    Filed: 08/04/16    Entered: 08/04/16 16:14:43    Page 16 of 43

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect

Case: 16-51265    Doc# 20-3    Filed: 08/04/16    Entered: 08/04/16 16:14:43    Page 17
of 43

its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01
© 1999-2004 Online Documents, Inc.                                      Page 7 of 12

Initials: ▮▮▮▮▮
CAEDEDL  0402
11-15-2007 18:21

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can

agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT  Form 3005 1/01
© 1999-2004 Online Documents, Inc.  Page 9 of 12

Initials: _RTIA_
CAEDEDL 0402
11-15-2007 18:21

all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and

radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

CALIFORNIA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3005 1/01          Initials: RT FA
© 1999-2004 Online Documents, Inc.                **Page 10 of 12**                                    CAEDEDL   0402
                                                                                          11-15-2007 18:21

Case: 16-51265   Doc# 20-3   Filed: 08/04/16   Entered: 08/04/16 16:14:43   Page 21 of 43

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Case: 16-51265   Doc# 20-3   Filed: 08/04/16   Entered: 08/04/16 16:14:43   Page 22 of 43

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
ROOMEN TELLO

_____ (Seal)
TULA APONTE

_____ (Seal)
Luis Roberto Arroyo-Egoavil

State of CALIFORNIA                    County of SANTA CLARA

On 11/6/07 , before me G R Escamilla Notary Public
(here insert name and title of the officer), personally appeared
ROOMEN TELLO AND TULA APONTE

personally-known-to-me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

G. R. ESCAMILLA
COMM. #1489516
Notary Public - California
Alameda County
My Comm. Expires Jun. 12, 2008

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01
© 1999-2004 Online Documents, Inc.                Page 12 of 12
CAEDEDL 0402
11-15-2007 18:21

11557727-001-PA

**Exhibit A**
**Legal Description**

All that certain real property in the City of Milpitas, County of Santa Clara, State of California, described as follows:

ALL OF LOT 91, AS SHOWN ON THAT CERTAIN MAP OF TRACT NO. 3480 PARKTOWN UNIT NO. 1, WHICH MAP WAS FILED FOR RECORD IN THE OFFICE OF THE RECORDER OF THE COUNTY OF SANTA CLARA, STATE OF CALIFORNIA ON JULY 25, 1963, IN BOOK 164 OF MAPS, PAGE(S) 16 AND 17.

V2 WBCD LOAN #
MIN:

# FIXED/ADJUSTABLE RATE RIDER
### (LIBOR One-Year Index (As Published In The Wall Street Journal)-
### Rate Caps-Ten-Year Interest Only Period)

THIS FIXED/ADJUSTABLE RATE RIDER is made this **15TH** day of **NOVEMBER, 2007,** and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to **FLAGSTAR BANK, FSB, A FEDERALLY CHARTERED SAVINGS BANK**

("Lender") of the same date and covering the property described in the Security Instrument and located at: **1485 OLYMPIC DR**
**MILPITAS, CA 95035-6515**

**THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES

The Note provides for an initial fixed interest rate of **6.125%.** The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the **1ST** day of **DECEMBER, 2012,** and the adjustable interest rate I will pay may

Initials: _R.T.A_

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Ten-Year Interest Only Period-Single Family-
Fannie Mae Uniform Instrument Form 3153 2/06
© 2006 Online Documents, Inc. Page 1 of 5 F3153RDU F3153RLU 0802
11-15-2007 18:21

change on that day every 12TH month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

### (B) The Index

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in **The Wall Street Journal**. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO AND FIVE-EIGHTHS percentage point(s) ( 2.625% ) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

### (D) Limits on Interest Rate Changes

The interest rate I am required to pay at the first Change Date will not be greater than 11.125% or less than 2.625%. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than TWO percentage point(s) ( 2.000% ) from the rate

Initials: RoTTA

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Ten-Year Interest Only Period-Single Family-
Fannie Mae Uniform Instrument Form 3153 2/06

© 2006 Online Documents, Inc.                    Page 2 of 5                    F3153RLU 0602
                                                                  11-15-2007 18:21

of interest I have been paying for the preceding 12 month(s). My interest rate will never be greater than 11.125%.

V2 WBCD LOAN #

### (E) Effective Date of Changes

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

### (F) Notice of Changes

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### (G) Date of First Principal and Interest Payment

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

## B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

1. Until Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

Initials: _R·T TA_

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Ten-Year Interest Only Period-Single Family-Fannie Mae Uniform Instrument Form 3153 2/06
© 2006 Online Documents, Inc.                 Page 3 of 5                           F3153RLU 0602
11-15-2007 18:21

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2.   When Borrower's initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to

Initials: _RTTA_

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Ten-Year Interest Only Period-Single Family-Fannie Mae Uniform Instrument Form 3153 2/06
© 2006 Online Documents, Inc.                     Page 4 of 5                     F3153RLU  0802
11-15-2007 18:21

Case: 16-51265    Doc# 20-3    Filed: 08/04/16    Entered: 08/04/16 16:14:43    Page 28 of 43

pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
RODMEN TELLO

_____ (Seal)
TULA APONTE

_____ (Seal)
Luis Roberto Arroyo-Egoavil

MULTISTATE FIXED/ADJUSTABLE RATE RIDER-WSJ One-Year LIBOR-Ten-Year Interest Only Period-Single Family-
Fannie Mae Uniform Instrument Form 3153 2/06
© 2006 Online Documents, Inc.                    Page 5 of 5                          F3153RLU  0602
                                                                                      11-15-2007 18:21

Recording Requested By:
Flagstar Bank, FSB
Prepared By: Debora C. Cox
450 E. Boundary St.
Chapin, SC 29036
888-603-9011
When recorded mail to:
CoreLogic
450 E. Boundary St.
Attn: Release Dept.
Chapin, SC 29036

Case Nbr:
Ref Number:
Property Address:
1485 OLYMPIC DR
MILPITAS, CA 95035
CA0-ADT 32713549    4/27/2015

This space for Recorder's use

## ASSIGNMENT OF DEED OF TRUST

For Value Received, the undersigned holder of a Deed of Trust (herein "Assignor") whose address is **5151 CORPORATE DRIVE, TROY, MI 48098** does hereby grant, sell, assign, transfer and convey unto **WESTVUE NPL TRUST II C/O LONGVUE MORTGAGE CAPITAL, INC.** whose address is **895 DOVE STREET, STE 125, NEWPORT BEACH, CA 92660** all beneficial interest under that certain Deed of Trust described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Deed of Trust.

| | |
|---|---|
| Beneficiary: | **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR FLAGSTAR BANK, FSB., ITS SUCCESSORS AND ASSIGNS** |
| Original Borrower(s): | **RODMEN TELLO AN UNMARRIED MAN AS TO AN UNDIVIDED 49% INTEREST, TULA APONTE AN UNMARRIED WOMAN AS TO AN UNDIVIDED 2% INTEREST AND LUIS ROBERTO ARROYO-EGOAVIL AS TO AN UNDIVIDED 49% INTEREST AS TENANTS IN COMMON** |
| Original Trustee: | **JOAN H. ANDERSON** |
| Date of Deed of Trust: | **11/15/2007** |
| Original Loan Amount: | **$417,000.00** |

Recorded in **Santa Clara County**, CA on: **11/21/2007**, book N/A, page N/A and instrument number **19659746**

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Deed of Trust to be executed on
4-27-15

FLAGSTAR BANK, FSB

By:

Brian A. Bohrer, Vice President

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of **South Carolina**
County of **Richland**

On 4-27-15 before me, **Coletta R Bethea**, Notary Public, personally appeared **Brian A. Bohrer**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Notary Public: **Coletta R Bethea**     (Seal)
My Commission Expires: **6/12/2022**

COLETTA R. BETHEA
Notary Public
State of South Carolina
My Commission Expires 06/12/2022

LAWYERS TITLE COMPANY
Recording Requested By:
**T.D. SERVICE COMPANY**

And When Recorded Mail To:
T.D. Service Company
LR Department (Cust# 668)
4000 W Metropolitan Dr Ste 400
Orange, CA 92868

RECORDED ON: 01/19/2016
INSTRUMENT: 23199224
OFFICIAL RECORDS OF: SANTA CLARA

Customer#: ████    Service#: ████
Loan#: ████



*T·S # 81167* **ASSIGNMENT OF DEED OF TRUST**

FOR VALUE RECEIVED, WESTVUE NPL TRUST II, 895 DOVE STREET, SUITE 125, NEWPORT BEACH, CA 92660-0000, hereby assign and transfer to WVUE 2015-1, 895 DOVE STREET, SUITE 125, NEWPORT BEACH, CA 92660-0000, all its right, title and interest in and to said Deed of Trust in the amount of $417,000.00, recorded in the State of CALIFORNIA, County of SANTA CLARA Official Records, dated NOVEMBER 15, 2007 and recorded on NOVEMBER 21, 2007, as Instrument No. 19659746, in Book No. ---, at Page No. ---.

Executed by Rodmen Tello, Tula Aponte and Luis Roberto Arroyo-Egoavil, as trustors, Joan H Anderson, as trustee and, Flagstar Bank, FSB as the original beneficiary.

Legal Description: As more fully described in said Deed of Trust.

Date: DECEMBER 11, 2015
WESTVUE NPL TRUST II, BY: LONGVUE MORTGAGE CAPITAL, INC, ITS SERVICER

By: _____
    Dennis Regan, Executive Vice President

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Orange

On December 11, 2015 before me, Derek Joseph Basterrechea a Notary Public, personally appeared Dennis Regan, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

Name: Derek Joseph Basterrechea
       (Typed or Printed)

(Seal)

DEREK JOSEPH BASTERRECHEA
COMM. # 2099671
NOTARY PUBLIC • CALIFORNIA
ORANGE COUNTY
Comm. Exp FEB. 9, 2019

EsInitials

1  James Cai, SBN 200189
   SCHEIN & CAI LLP
2  111 North Market Street, Suite 1020
   San Jose, California 95113
3  Telephone: (408) 436-0789
   Facsimile: (408) 436-0758
4
   Attorneys for Debtor,
5  TULA APONTE

IT IS SO ORDERED.
Signed October 27, 2011

_Arthur S. Weissbrodt_
Arthur S. Weissbrodt
U.S. Bankruptcy Judge

6

7

8                  UNITED STATES BANKRUPTCY COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11  In re: TULA APONTE,              )  Case No.: 11-58431    ASW
                                     )
12                         Debtor.   )  CHAPTER 13
                                     )
13                                   )
                                     )
14                                   )  ORDER GRANTING
                                     )  DEBTOR'S MOTION FOR VOLUNTARY
15                                   )  DISMISSAL OF CHAPTER 13 PETITION
                                     )
16                                   )
                                     )
17                                   )
                                     )
18                                   )

19       This matter having come before the Court on the Debtor's Motion for Voluntary

20  Dismissal of Chapter 13 Petition, filed on October 18, 2011. After reviewing the Motion, and

21  there being no timely opposition or request for hearing filed and served,

22

23       **IT IS HEREBY ORDERED THAT:**

24       1.    The Motion is GRANTED.

25       2.    The herein Chapter 13 Petition is DISMISSED.

26

27

28                          *END OF ORDER*

                                    **EXHIBIT " 3 "**

## COURT SERVICE LIST

Devin Derham-Burk
PO Box 50013
San Jose, CA 95150-0013

FIA CARD SERVICES, N.A.
PO Box 15102
Wilmington, DE 19886-5102

Flagstar Bank
5151 Corporate Dr
Troy, MI 48098

GE Capital Retail Bank
c/o Recovery Management Systems Corp.
25 SE 2nd Avenue, Suite 1120
Miami, FL 33131-1605

James Jingming Cai
Schein and Cai LLP
111 North Market St. #1020
San Jose, CA 95113

Office of the U.S. Trustee/SJ
U.S. Federal Building
280 South First Street, #268
San Jose, CA 95113-3004

Tula Aponte
1485 Olympic Dr.
Milpitas, CA 95105-0013

2

Form NDC

# UNITED STATES BANKRUPTCY COURT
## Northern District of California

| | |
|---|---|
| In Re:  Tula Aponte<br>  aka   Tula Miriam Aponte Cabrero<br>      Debtor(s) | Case No.: 11–61063 SLJ 13<br><br>Chapter:  13 |

## ORDER AND NOTICE OF DISMISSAL
## FOR FAILURE TO COMPLY

   **Notice is given** the debtor(s) having failed to comply with this court's order filed on 09/05/2013 , it is ordered that this case is hereby **dismissed**.

Dated: <u>10/11/13</u>

By the Court:

Stephen L. Johnson
United States Bankruptcy Judge



EXHIBIT "4"

DEVIN DERHAM-BURK, ESQ. #104353
CHAPTER 13 STANDING TRUSTEE
DEVIN L. PACE, ESQ. #256514
NANETTE DUMAS, ESQ. #148261
JANE Z. BOHRER, ESQ. #243692
P.O. BOX 50013
SAN JOSE, CA 95150-0013
TELEPHONE:   (408) 354-4413
FACSIMILE:   (408) 354-5513

**IT IS SO ORDERED.**
Signed June 24, 2015

*Arthur S. Weissbrodt*

Arthur S. Weissbrodt
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF CALIFORNIA - DIVISION 5

IN RE:

TULA APONTE,

               Debtor.

CHAPTER 13 CASE No. 14-51195 ASW

**ORDER FOLLOWING COURT HEARING
RE CHAPTER 13 CASE**

Hearing Date:  June 16, 2015
Hearing Time:  10:00 a.m.
Judge:  Hon. Arthur S. Weissbrodt
Place:   United States Bankruptcy Court
       280 S. First Street, Courtroom 3020
       San Jose, CA 95113

    A hearing was held in this case on June 16, 2015 at 10:00 a.m.  The above-captioned

debtor (the "Debtor") filed this case on March 20, 2014.  The Debtor's chapter 13 plan remains

unconfirmed.  Based on the record before the Court, and good cause appearing therefor, IT IS

HEREBY ORDERED THAT:

    1.     If the Debtor has not confirmed a chapter 13 plan or converted this case by

September 30, 2015, this case shall be dismissed without prejudice effective September 30,

2015 without further hearing or further order of the Court;

    2.     If the case is dismissed effective September 30, 2015:

# EXHIBIT "5"

(a) after payment of allowed adequate protection payments, if any, and administrative costs or fees, the Trustee shall return to the Debtor any remaining balance of the Debtor's funds on hand;

(b) Notwithstanding the dismissal of the case, the Trustee shall remit to the Clerk of the Court funds from any previously disbursed checks that remain un-cashed;

(c) The Trustee shall submit at a later date her Trustee's Final Report for approval by the Court; and

(d) Notice of the dismissal shall be served upon all parties by the Clerk of the Court; and

3.      If the Debtor has either confirmed a chapter 13 plan or converted this case by September 30, 2015, this case shall <u>not</u> be dismissed.

**\*\*\* END OF ORDER \*\*\***

## COURT SERVICE LIST

Case Name:  In re TULA APONTE

Case No.:  14-51195 ASW

Registered ECF Participants will receive an electronically mailed copy of the foregoing document.

Non-registered parties, and/or those not represented by a registered ECF participant:

NONE.

Form DOC

# UNITED STATES BANKRUPTCY COURT
## Northern District of California

| | |
|---|---|
| In Re: | Tula Aponte | Case No.: 14−51195 MEH 13 |
| aka | Tula Miriam Aponte Cabrero | Chapter: 13 |
| | Debtor(s) | |

## NOTICE OF DISMISSAL OF CASE

**Notice is given** that an order was filed on 9/30/15 dismissing the above−captioned case.

Dated: <u>10/2/15</u>

For the Court:

Edward J. Emmons
Clerk of Court
United States Bankruptcy Court

Doc # 70

Form ODSC7fi

# UNITED STATES BANKRUPTCY COURT
## Northern District of California (San Jose)

| | |
|---|---|
| In re:<br>   Rodmen Tello<br>   aka Rodmen Tello Ramos<br>   955 Foxchase Drive #433<br>   San Jose, CA 95123 | Case Number: 14−54898 ASW 7<br>Chapter: 7 |

Debtor(s)

Debtor/Joint Debtor Social Security Number(s):
   xxx−xx−0914

## DISCHARGE OF DEBTOR AND FINAL DECREE

It appearing that the debtor(s) is/are entitled to a discharge, **IT IS ORDERED**:
The debtor(s) is/are granted a discharge under section 727 of title 11, United States Code, (the Bankruptcy Code).

It further appears that the trustee, Fred Hjelmeset in the above−entitled case has filed a report of no distribution and said Trustee has performed all other and further duties required in the administration of said estate; accordingly, it is hereby

ORDERED that the chapter 7 case of the above−named debtor is closed; that the Trustee is discharged and relieved of said trust.

Dated: <u>3/24/15</u>

By the Court:

Arthur S. Weissbrodt
United States Bankruptcy Judge

## SEE THE BACK OF THIS ORDER FOR IMPORTANT INFORMATION.

Doc # 21

EXHIBIT " 6 "

Case: 14-54898    Doc# 21    Filed: 03/24/15    Entered: 03/24/15 22:01:45    Page 1 of 2

## EXPLANATION OF BANKRUPTCY DISCHARGE
## IN A CHAPTER 7 CASE

This court order grants a discharge to the person named as the debtor. It is not a dismissal of the case and it does not determine how much money, if any, the trustee will pay to creditors.

### Collection of Discharged Debts Prohibited

The discharge prohibits any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a discharged debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor. *[In a case involving community property:]* A creditor who violates this order can be required to pay damages and attorney's fees to the debtor. [There are also special rules that protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.] A creditor who violates this order can be required to pay damages and attorney's fees to the debtor.

However, a creditor may have the right to enforce a valid lien, such as a mortgage or security interest, against the discharged the debtor's property after the bankruptcy, if that lien was not avoided or eliminated in the bankruptcy case. Also, a debtor may voluntarily pay any debt that has been discharged.

### Debts That are Discharged

The chapter 7 discharge order eliminates a debtor's legal obligation to pay a debt that is discharged. Most, but not all, types of debts are discharged if the debt existed on the date the bankruptcy case was filed. (If this case was begun under a different chapter of the Bankruptcy Code and converted to chapter 7, the discharge applies to debts owed when the bankruptcy case was converted.)

### Debts that are Not Discharged.

Some of the common types of debts which are <u>not</u> discharged in a chapter 7 bankruptcy case are:

a. Debts for most taxes;

b. Debts incurred to pay nondischargeable taxes (applies to cases filed on or after 10/17/2005);

c. Debts that are domestic support obligations;

d. Debts for most student loans;

e. Debts for most fines, penalties, forfeitures, or criminal restitution obligations;

f. Debts for personal injuries or death caused by the debtor's operation of a motor vehicle, vessel, or aircraft while intoxicated;

g. Some debts which were not properly listed by the debtor;

h. Debts that the bankruptcy court specifically has decided or will decide in this bankruptcy case are not discharged;

i. Debts for which the debtor has given up the discharge protections by signing a reaffirmation agreement in compliance with the Bankruptcy Code requirements for reaffirmation of debts.

j. Debts owed to certain pension, profit sharing, stock bonus, other retirement plans, or to the Thrift Savings Plan for federal employees for certain types of loans from these plans (applies to cases filed on or after 10/17/2005).

**This information is only a general summary of the bankruptcy discharge. There are exceptions to these general rules. Because the law is complicated, you may want to consult an attorney to determine the exact effect of the discharge in this case.**

**Bankruptcy Filed: April 27, 2016**
**Due Date of Monthly Payment: 1st day of each month**
**Payment Amount: $1,216.25**

| Date Payment Received: | Payment Due Date: | Payment Amount Due: | Payment Amount Received: | Month Applied To: | Suspense |
|---|---|---|---|---|---|
| n/a | 5/1/2016 | $1,216.25 | $0.00 | | |
| n/a | 6/1/2016 | $1,216.25 | $0.00 | | |
| n/a | 7/1/2016 | $1,216.25 | $0.00 | | |

EXHIBIT "7"